## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MEGHAN GIOFFE, MELISSA ANIDO, and ALAN WURZELBACHER, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, d/b/a AUDI OF AMERICA, INC., AUDI AG, a German corporation, and VOLKSWAGEN AG, a German corporation,<br><br>Defendants. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Plaintiffs Meghan Gioffe, Melissa Anido, and Alan Wurzelbacker ("Plaintiffs") bring this action for themselves and on behalf of all similarly situated persons ("Class Members") in the United States who purchased or leased any 2017 or later model Audi vehicle equipped with a gateway control module (designated by Defendants as a "J533" module) located under the rear bench seats ("Class

Vehicles")[1] against Volkswagen Group of America, Inc., ("VWGoA") d/b/a Audi of America, Inc., Audi AG, and Volkswagen AG ("VWAG") (collectively "VW" or "Defendants"). The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.    This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.    Defendants VWAG, Audi AG, or both, designed and manufactured the Class Vehicles, and Defendant VWGoA imported, distributed, marketed, and sold the Class Vehicles through its extensive network of authorized dealerships in the United States. Defendant VWGoA also provides service and maintenance for the Class Vehicle at dealers and service providers nationwide, using information provided by VWAG, Audi AG, or both.

4.    Defendants sold, directly or indirectly, through their agent dealers and other retail outlets, the Class Vehicles throughout the United States, without disclosing that the Class Vehicles' gateway control module was dangerously exposed to moisture infiltration by placing it in an unsealed compartment located below the rear bench seat of the vehicles where it was easily exposed to liquid.  The

---

[1] The Class Vehicles include 2018 to present model years of Audi Q5, Audi SQ5, Audi Q7, and Audi A8 vehicles.

compartment allows rainwater to infiltrate the module from outside the vehicle as well as allows liquids from everyday spills in the interior of the vehicle to reach the gateway module.

5.  A gateway module is one of the central control units in any modern vehicle.  It functions as the relay through which different control modules communicate, including the modules responsible for controlling a vehicle's drivetrain and the airbags.  For example, if the Audi lane change assist control module, responsible for recognizing the possibility of a collision to the vehicle, identifies a possible collision situation, it forwards that information to the gateway module.  The gateway module, in turn, sends that information to the airbag control module, which identifies actuators to activate.

6.  The proper functioning of the gateway control module is essential in Class Vehicles.  As a result, if the gateway control module is damaged, the vehicle immediately displays several warnings and shuts down even if it is currently being driven.  Often, a driver will be unable to turn the vehicle back on.

7.  VW wrongfully and intentionally concealed a defect in the design, manufacture, and/or workmanship of the gateway control module and the compartment in which it sits such that liquid easily infiltrates the module and destroys it (the "Defect"). The Defect allows both minute amounts of liquid spilled inside the vehicle and rainwater which splashes up from the road from outside the

vehicle to access the gateway control module.  As a result, the gateway control module fails and immediately shuts down the vehicle. Plaintiffs and Class Members incur out of pocket costs to repair or replace the damaged engine control module because VWGoA denies warranty coverage for this issue.  Replacement of the gateway control module costs between $1,300 and $1,800, not including any repairs to other components that also may be damaged when the module shorts.

8.     While some Class Members have instead received "goodwill" replacement of the gateway control module, they are specifically cautioned that any further damage will not be covered by goodwill.  Further, Class Members have been instructed by authorized dealerships to avoid bringing any liquids into the vehicles, for fear of spills, and to avoid driving their vehicles in the rain.

9.     Moreover, Defendants failed to disclose the existence of the Defect and further, gave consumers no warnings prior to the purchase of their vehicles that the vehicles are particularly susceptible to sudden failure due to the Defect. Instead, Defendants placed this critical vehicle component beneath the rear bench, directly under cupholders, thereby encouraging passengers to bring their beverages into the vehicle. Despite creating this risk, Defendants failed to put in a liquid-proof shielding to avoid such calamity. Certainly, no reasonable consumer would purchase a vehicle that is unable to be driven during a rainstorm.

10.     The Defect presents a safety risk for Plaintiffs and Class Members

because the gateway control module suddenly and unexpectedly fails, resulting in the Class Vehicles immediately losing power. It goes without saying that a sudden loss of power poses a clear-cut safety risk—it can prevent the driver from accelerating, maintaining speed, adequately controlling the steering wheel, or engaging the brakes, all of which drastically increase the risk of collisions.

11.    The Defect is inherent in each Class Vehicle and was present at the time of sale.

12.    VW was sufficiently aware of the Defect from: pre-production testing; design failure mode analysis; requests for warranty coverage; aggregate purchases of replacement gateway control modules; calls to its customer service hotline; and customer complaints made directly to its agent dealers.  Further, in August 2020, automobile safety regulators contacted VW regarding reports of vehicle failures due to liquid intrusion into the gateway control module which prompted VW to begin an immediate investigation.  However, this knowledge and information was exclusively in the possession of VW and its network of dealers, who are Defendants' agents for repairs. Such information, however, was unavailable to consumers.

13.     The Defect is material because it poses a serious safety concern. As attested by Class Members in numerous complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Defect can

impair any driver's ability to control his or her vehicle and greatly increase the risk of collision.

14.    The Defect is also material because consumers incur significant and unexpected repair costs. VW's failure to disclose, at the time of purchase, the gateway control module compartment's vulnerability to liquid is material because no reasonable consumer expects that their vehicle will be unable to be driven in the rain or be so vulnerable as to make bringing a bottle of water in the backseat an unacceptable risk.

15.    Had VW disclosed the Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them.

## THE PARTIES

### Plaintiff Meghan Gioffe

16.    Plaintiff Meghan Gioffe is a citizen of Connecticut, domiciled in Newtown, Connecticut.

17.    On or around March 25, 2021, Plaintiff Gioffe purchased a new 2021 Audi Q5 from New Country Audi, an authorized Audi dealership located in Greenwich, Connecticut.

18.    Plaintiff Gioffe purchased her vehicle primarily for personal, family, or household use.

19.    Passenger safety and reliability were important factors in Plaintiff

Gioffe's decision to purchase her vehicle. Before making her purchase, Plaintiff Gioffe visited Audi's website to research the 2021 Q5 and reviewed the Monroney Sticker (i.e. the "window sticker"), which listed official information about the vehicle including its safety rating, affixed to the vehicle. Moreover, before making her purchasing decision, Plaintiff Gioffe test drove a 2021 Audi Q5 with an authorized dealership salesperson. During the test drive, Plaintiff and the salesperson discussed the vehicle, and the salesperson made no mention of the Defect. Plaintiff Gioffe believed that her 2021 Audi Q5 would be a safe and reliable vehicle.

20.    VW's omissions were material to Plaintiff Gioffe. Had VW disclosed its knowledge of the Defect, including ,through any media—such as internet sites and ads, the Monroney sticker or through dealership personnel—before she purchased her vehicle, Plaintiff Gioffe would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Gioffe would not have purchased her vehicle, or would have paid less for it.

21.    In order to protect the interior of her vehicle from spills from children and/or the mess of her dog, Plaintiff Gioffe purchased an Orvis waterproof cushion and placed it on the backseat of the vehicle.

22.    On November 9, 2021, with 13,200 miles on the odometer of her vehicle, Plaintiff Gioffe was driving her children home from the pediatrician's

office when suddenly multiple error messages flashed on the dashboard and the vehicle began to lose power. Hurriedly, she managed to maneuver the vehicle to the side of the road before it lost all power and shut down. She was unable to turn on the vehicle again, shift the vehicle from drive to park, set the parking brake, or do anything else to secure her vehicle. Plaintiff Gioffe was stranded at the side of the road with her two children.

23.    Plaintiff Gioffe called for assistance. Because the vehicle would not turn or shift, her 2021 Audi Q5 had to be dragged onto the flatbed of a wrecker in order to be transported to an authorized Audi dealership for repair. Her vehicle was transported to Audi Danbury, an authorized Audi dealership located in Danbury, Connecticut.

24.    At Audi Danbury, the rear seat was found to be slightly damp. The technician removed the Orvis cushion, the rear seat bench, and found water stains on the gateway control module. The technician diagnosed the vehicle as having a wet gateway control module.

25.    Despite Plaintiff Gioffe asking for the repair to be covered under warranty, the dealership charged her $1,427.24 for the replacement of the gateway control module in her vehicle as well as for performing "component protection" on the vehicle. Plaintiff Gioffe paid for the repairs out-of-pocket. She was also without her vehicle for over a week.

26.    Plaintiff Gioffe's vehicle remains subject to the Defect.  Because she fears the gateway control module is very vulnerable, she no longer permits her children to have water bottles in the backseat.

27.    At all times, Plaintiff Gioffe, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and as it was intended to be used. At all times, Plaintiff Gioffe has properly maintained her vehicle according to the maintenance schedules published by VWGoA.

28.    Although Plaintiff Gioffe is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Melissa Anido**

29.    Plaintiff Melissa Anido is a Florida citizen who is domiciled in Miami, Florida.

30.    On or around April 26, 2021, Plaintiff Anido purchased a new 2021 Audi Q5 from The Collection, an authorized Audi dealership located in Coral Gables, Florida.

31.    Plaintiff Anido purchased her vehicle primarily for personal, family, or household use.

32.    Passenger safety and reliability were important factors in Plaintiff Anido's decision to purchase her vehicle. Before making her purchase, Plaintiff

Anido viewed the Audi corporate and the dealership's websites. Before making her purchasing decision, Plaintiff Anido test drove the vehicle she ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Anido and the salesperson discussed the vehicle, and the salesperson made no mention of the Defect. Also, before purchase, Plaintiff Anido reviewed the vehicle's Monroney Sticker (a.k.a. the "window sticker") which listed official information about the vehicle including safety information. Like the other sources of information about the car, in the Monroney Sticker, Defendants made no reference to the Defect. Plaintiff Anido believed that her 2021 Audi Q5 would be a safe and reliable vehicle.

33.    VW's omissions were material to Plaintiff Anido. Had VW disclosed its knowledge of the Defect, including through any media—such as internet sites and ads, the Monroney sticker or through dealership personnel—before she purchased her vehicle, Plaintiff Anido would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Anido would not have purchased her vehicle, or would have paid less for it.

34.    On November 18, 2021, while it was raining, Plaintiff Anido was driving with her children in the backseat when multiple warning messages came up on her dashboard. She managed to turn her vehicle onto a side street before it shut down completely.  Plaintiff Anido restarted the vehicle and it moved

sluggishly for approximately two blocks before it shut down again. Plaintiff Anido could not turn on the vehicle again.

35.    Plaintiff Anido had her vehicle taken to The Collection. There, the technician discovered water in the compartment with the gateway control module. The gateway control module, a fuse, and the vehicle's battery all had to be replaced as a result. Plaintiff Anido does not know how water got into the compartment.

36.    VWGoA refused to provide a repair under warranty. Plaintiff Anido was charged $2,495.87 for repairs to her vehicle. She submitted the claim to the insurance carrier for her vehicle and paid the $500 deductible. She was also without her vehicle for nearly a month.

37.    Plaintiff Anido's vehicle remains subject to the Defect. She is particularly fearful that the vehicle will shut down again without warning.

38.    At all times, Plaintiff Anido, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and as it was intended to be used. At all times, Plaintiff Anido has properly maintained her vehicle according to the maintenance schedules published by VWGoA.

39.    Although Plaintiff Anido is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Alan Wurzelbacher**

40.    Plaintiff Alan Wurzelbacher is an Illinois citizen who is domiciled in St. Charles, Illinois.

41.    On or around December 18, 2020, Plaintiff Wurzelbacher purchased a pre-owned 2021 Audi Q5 with approximately 38 miles on the odometer from Audi Westmont, an authorized Audi dealership located in Westmont, Illinois.

42.    Plaintiff Wurzelbacher purchased his vehicle primarily for personal, family, or household use.

43.    Passenger safety and reliability were important factors in Plaintiff Wurzelbacher's decision to purchase his vehicle. Before making his purchase, Plaintiff Wurzelbacher did an online search for the vehicle on Google and read Consumer Reports about the vehicle. He also viewed the Audi corporate and the dealership's websites. Before making his purchasing decision, Plaintiff Wurzelbacher test drove the vehicle he ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Wurzelbacher and the salesperson discussed the vehicle, and the salesperson made no mention of the Defect. Also, before purchase, Plaintiff Wurzelbacher reviewed the vehicle's Monroney Sticker (a.k.a. the "window sticker") which listed official information about the vehicle including safety information. Like the other sources of information about the car, in the Monroney Sticker the Defendants made no reference to the Defect. Plaintiff Wurzelbacher believed that his 2021 Audi Q5

12

would be a safe and reliable vehicle.

44.    VW's omissions were material to Plaintiff Wurzelbacher. Had VW disclosed its knowledge of the Defect including through any media—such as internet sites and ads, the Monroney sticker, or through dealership personnel— before he purchased his vehicle, Plaintiff Wurzelbacher would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Wurzelbacher would not have purchased his vehicle, or would have paid less for it.

45.    On October 15, 2021, Plaintiff Wurzelbacher was driving when his vehicle's electrical systems began to malfunction.  Multiple warning messages came up on his dashboard and his vehicle became sluggish and unresponsive before abruptly shutting down completely.  The vehicle eventually restarted, although warning lights continued to flash, and Plaintiff Wurzelbacher was able to drive the vehicle to the dealership approximately four miles away.

46.    Plaintiff Wurzelbacher had his vehicle taken to Audi Exchange, an authorized Audi dealership located in St. Charles, Illinois.  There, the technician discovered water on the gateway control module.

47.    VWGoA refused to provide a repair under warranty.  However, after the technician described the issue as "water was found due to outside influence," Audi agreed to provide a "goodwill" repair.  Plaintiff Wurzelbacher received a

warning that VWGoA would not provide another goodwill repair if it happened again and to be very careful with his vehicle in the future.

48.    Plaintiff Wurzelbacher's vehicle remains subject to the Defect.

49.    At all times, Plaintiff Wurzelbacher, like all Class Members, attempted to drive his vehicle in a manner both foreseeable and in which it was intended to be used. At all times, Plaintiff Wurzelbacher has properly maintained his vehicle according to the maintenance schedules published by VWGoA.

50.    Although Plaintiff Wurzelbacher is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on VW's advertising for or labeling of the vehicles.

**<u>Defendants</u>**

51.    Defendant VWGoA is an entity incorporated in New Jersey with its principal place of business and headquarters at 220 Ferdinand Porsche Drive, Herndon, Virginia 20171. At this facility, VWGoA coordinates the United States operations and activities of the Volkswagen, Audi, Bentley, Bugatti, and Lamborghini brands, as well as the activities of its 8,000 employees and its subsidiary, VW Credit, Inc. One of VWGoA's fictious names is Audi of America, Inc., which it has registered with the Virginia Secretary of State.

52.    Defendant VWGoA, through its various entities, markets, distributes, warranties, and sells Audi-branded automobiles and parts for those automobiles,

including the Class Vehicles, in multiple locations across the United States, including Connecticut, Florida, and Illinois.

53.     In order to sell vehicles to the general public, VWGoA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Audi-branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties VWGoA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership are completed according to VWGoA, Audi AG, and VWAG instructions, issued through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents. Per the agreements between VWGoA and the authorized dealers, consumers such Plaintiffs are able to receive services under VWGoA's issued warranty at dealer locations that are convenient to them. These agreements provide VWGoA with a significant amount of control over the actions of the authorized dealerships, of which there are nearly 1,000 in the United States.

54.     VWGoA, in conjunction with VWAG and Audi AG, drafted the warranties it provides directly to consumers such as Plaintiffs.  These warranties are provided on a take-it-or-leave it basis and give VWGoA the sole power in determining whether a repair is coverable by the warranty.  VwGoA designates its

authorized dealerships as its agents to perform warranty repairs.

55.     VWGoA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. VWGoA also is responsible for the content of the Monroney Stickers on Volkswagen and Audi-branded vehicles.

56.     Defendant Volkswagen AG is an entity incorporated in and registered to do business in Germany with its principal place of business at Berliner Ring 2, 38440, Wolfsburg, Germany. This facility also encompasses a 70 million sq. ft. manufacturing facility, the Wolfsburg Volkswagen Plant, where over 800,000 vehicles are produced each year. The Wolfsburg headquarters also have individual production facilities, specialty production plants, warehouses, and administration buildings, with over 20,000 employees. VWAG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Volkswagen, Skoda, and Audi-branded vehicles and parts for those vehicles worldwide, including the in the United States.

57.     VWAG is the parent corporation of VWGoA and Audi AG, which are each wholly owned subsidiaries. VWAG is also the parent corporation of the United States manufacturing facilities for Volkswagen and Audi-branded vehicles. For all its United States subsidiaries, including VWGoA, VWAG and/or Audi AG provide all the technical information for the purpose of manufacturing, servicing,

and repairing the Class Vehicles. VWAG selected New Jersey for the original site of VWGoA's headquarters and chose to have VWGoA incorporated as a New Jersey entity. Each year since 2016, VWAG has reported over 35 billion euros (or over 41 billion in U.S. dollars) of revenue from its North American activities via VWGoA and its network of authorized dealerships.

58.    Defendant Audi AG is an entity incorporated and registered in Germany with its principal place of business at Auto-Union-Str. 2 D-85045, Ingolstadt, Germany. The Ingolstadt facility encompasses both corporate offices, which coordinate and supervise its worldwide operations, and a factory totalling over 30 million sq. ft., which produces over 300,000 vehicles a year. As of the end of 2020, over 43,000 employees worked at this facility.  Audi AG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Audi-branded vehicles and parts for those vehicles worldwide, including in the United States.

59.    The relationship between VWAG and VWGoA is governed by a General Distributor Agreement that gives Audi AG and/or VWAG the right to control nearly every aspect of VWGoA's operations related to both Volkswagen and Audi-branded vehicles—including sales, marketing, management policies, information governance polices, pricing, and warranty terms.

60.    For all VWAG United States subsidiaries, including VWGoA, VWAG

and/or Audi AG provides all the technical and information for the purpose of servicing and repairing the Class Vehicles, as well as the information needed to draft the owners' manuals.

61.    At all relevant times, VW was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components in New Jersey and throughout the United States of America.

## JURISDICTION

62.    This is a class action.

63.    Plaintiffs and members of the proposed Class are citizens of states different from the home state of Defendants.

64.    The aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

65.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

66.    Defendants, through their business of distributing, selling, and leasing the Class Vehicles, have established sufficient contacts in this district such that personal jurisdiction is appropriate. As such, Defendants are deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)-(d).

67.    In addition, a substantial part of the events or omissions giving rise to

these claims took place in this District because VWGoA is incorporated in this District.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

68.    For years, VW has designed, manufactured, distributed, sold, and leased the Class Vehicles. VW has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in New Jersey and nationwide. VW warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

69.    Beginning with the model year 2018, VW made the decision to move the gateway control module from behind the dashboard, near the steering column, to under the backseat bench in Class Vehicles.  Among the models within the Class Vehicles are  sedans, such as the A8, and crossover vehicles such as the Q5 and Q7.  In Figure 1, below, the J533 gateway control module is shown to be underneath the rear seat of the 2019 A8.



**Figure 1**

70.    The gateway control module, also called a Data Bus on Board Diagnostic Interface and designated "J533" by VW, is the network system gateway, the diagnostics master for the vehicle, the energy manager for both the low-voltage and medium-voltage electrical systems within the vehicle, and the interface for various other modules.  In particular, J533 facilitates communications for the instrument panel, the diagnostics systems, the infotainment system (including back-up cameras), and the comfort and convenience systems.

71.     This critical device sits in a compartment directly below the cushioning of the rear seat bench.  There is no material to shield the device from any liquid that may be spilled above.



**Figure 2[2]**

72.     Similarly, the compartment in which the gateway control module sits has an insufficient underbody seam, such that rainwater could enter the compartment if the vehicle travels over a puddle or otherwise if water splashes up from the road while traveling. This configuration also allows ambient moisture in

---

[2] Posted by user BarneyM at https://www.audiworld.com/forums/q5-sq5-mkii-discussion-218/control-module-ruined-moisture-corrosion-3001605/page3/

during periods of high humidity.

73.    Moreover, the gateway control module can be rendered inoperable by even minute amounts of liquid.  A milliliter or two of water can completely disable the module, and immediately thereafter, the entire vehicle.  As a result, even the use of waterproof coverings may not prevent minute traces of liquid from entering the compartment in which the gateway control module resides.

74.    Furthermore, when the gateway control module gets wet, it may also short out related components, including fuses and the battery.  When such problems occur, all of these components must also be replaced as well, with additional labor costs.

75.    Despite the Defect and the devastating effect of the gateway control module getting wet, VW does not warn consumers about the insufficient seam in the underbody of the Class Vehicles or that the module is unprotected from liquid intrusion from above.  Instead, VW encourages consumers to bring liquids into the backseat of the Class Vehicles by installing multiple cupholders in that very location.  For example, in the Q5, the cupholders are directly over the area in which

the gateway control module resides, as demonstrated in Figure 3, below.



**Figure 3**

76.     The decision to put the gateway control in an unprotected and unsealed

compartment is also improper because many of the Class Vehicles have sunroofs

directly over the vulnerable area, such as the panoramic sunroof on display in

Figure 4, below.  If a sunroof is open during a sudden downpour or leaks as a result

of a clogged drain, a common occurrence in the Class Vehicles, water can easily

get through to the rear seat and into the gateway control module compartment.



**Figure 4**

77.    VW advertised that the Class Vehicles were reliable and dependable, touting the advanced capabilities of its driver assist systems, or the comfort and convenience of the interior and infotainment systems without ever mentioning that the proper function of these systems depends on the gateway control module which was left dangerously unprotected underneath the rear seats.

78.    For example, in the brochure for the 2019 Audi A8, VW emphasizes the quality of its engineering:

> Advanced, in ways previously inconceivable. A presence, that comes with prestige. Influential, as imitators will soon follow. You don't have to imagine where mobility is headed now that the all-new Audi A8 has arrived. In the tradition of its predecessors, the A8 is both a design leader and a technological marvel, engineered to treat your senses and provide assistance on every drive. A vision, that's come to life. It's the present, on fast-forward.

79.     VW also promised that the 2019 Audi A8:



There's a beauty to intelligence that looks can't achieve.

Knowledge may be power, but its application is most important. By linking an array of sensors and cameras to a central driver assistance controller capable of up to 741 billion computations per second, the driver assistance features in the Audi A8 reached a new level of sophistication. These systems were engineered to help alert you to an impending event, acting like an extra pair of eyes or assisting during traffic congestion. By gathering data and turning it into greater awareness, you may like the A8 more for its brains than its looks.[1]

80.     Similarly, in a press release issued by VWGoA regarding the 2021 Audi Q5, VW declared that the vehicle "includes greater attention to detail."[3]

**Interior design and infotainment**
The interior of the new Q5 models includes greater attention to detail through functional refinements and additional driver focused technologies. Horizontal lines dominate the interior leading to the large 10.1 inch MMI® touchscreen (1,540 x 720 pixels) which serves as the focal point of the dashboard. This MMI® is backed by the all-new MIB 3 infotainment system which delivers drivers a better overall user experience through faster processing speeds and higher graphical resolution.

81.     VW also emphasized the driver assistance capabilities of the vehicle without ever mentioning the serious vulnerability of the Defect which could render

- Standard **Audi side assist** provides blind spot monitoring via LED indicators on the exterior mirror housings at speeds above 9 mph.
- Standard **Lane departure warning** helps keep the driver within the driving lane, if the lane is about to be departed, through corrective steering intervention and adjustable wheel vibration at speeds above 40 mph.
- Standard **Audi pre sense rear** (as part of Audi side assist) uses radar sensors in the rear bumper to help detect an impending rear-end collision, and can initiate preventative measures.

[3] Available at https://media.audiusa.com/en-us/releases/419 (last visited Jan. 11, 2022).

such systems useless.[4]

82.    Similarly, the brochures of the 2018 Audi Q7 (highlighted below in the paragraph) discuss the capabilities of the driver assist systems and even the airbag deployment system without mentioning that they are dependent on the proper function of the gateway control module which is left dangerously exposed by an insufficient underbody and no protection from liquids from above, be they from a water bottle or a malfunctioning panoramic sunroof.

## Having another layer of protection is no accident.

While we don't like to make light of potential risks on the road, our engineers were tasked with doing just that. Complementing the advanced occupant safety cell is airbag technology designed to respond differently based on seat position, and specially constructed crumple zones that give way upon impact to help mitigate potential injury in a collision. When you add all of this to the rigidity of laser seam-welded joints that help enhance each Audi we make, it becomes pretty clear: Helping diminish the impact of an unavoidable event doesn't happen by accident.

## Senses working overtime.

You'll find that we've developed available driver assistance technologies that work together to help keep you aware of your surroundings. Our optional night vision assistant uses infrared technology to help detect pedestrians or large animals. And standard Audi pre sense® basic closes the side windows and panoramic sunroof, tightens the front safety belts and prepares the brake system for a quicker response and more during an unusual or emergency maneuver.

---

[4] Id.

83.    Indeed, both the Q5 and Q7 models are specifically advertised as safe, reliable family vehicles.  VW should have been aware of a risk of spills in the backseat of these family vehicles and further should have: (1) warned consumers of the location and vulnerability of the gateway control module and; (2) provided better protection of the module by sealing the compartment in which it was located.

84.    Despite having ample opportunity to disclose the Defect and warn consumers about the associated safety risk—in advertising, brochures, Monroney Stickers, press releases, through conversations with dealership personnel, among others—VW never did so.

**The Defect Poses a Serious Safety Hazard**

85.    As discussed supra, when the gateway control module gets wet due to the fact that its compartment is not properly sealed, the Class Vehicles immediately lose power.  When a Class Vehicle loses power, it prevents the driver from accelerating or maintaining speed, and will stop completely in the middle of traffic. Drivers will not be able to control the steering properly or even activate the brakes. All of these situations drastically increase the risk of collisions, particularly at intersections and on highways.

**The Warranties Provided by VW for Audi-branded Vehicles**

86.    VWGoA, under its business name of Audi of America, Inc., provides warranties directly to Plaintiffs and consumers.  This New Vehicle Limited

27

Warranty covers "defects in manufacturer's material and workmanship," and is limited to "4 years or 50,000 miles from your vehicle's in-service date, whichever occurs first." This coverage includes the vehicle's control modules as well as the workmanship in assembling the vehicle.

87.     Despite the fact that the New Vehicle Limited Warranty is provided by VWGoA, the copyright to the warranty terms is held by Audi AG. As such, the warranty booklets provided to Plaintiffs and consumers by VWGoA are done so with the explicit permission and direction of Audi AG. Moreover, Audi AG is the author of the warranty terms.

88.     VWGoA also provides "Audi Certified pre-owned Limited Warranty" to vehicles purchased as "certified pre-owned" from authorized Audi dealerships. This Certified Pre-Owned Warranty provides that "[i]f Audi New Vehicles Limited Warranty (NVLW) coverage remains at the time of Certified pre-owned (CPO) purchased, CPO Limited Warranty Coverage commences upon expiration of NVLW and continues until 5 years from vehicle's original in-service date with no mileage limitation. If NVLW coverage has expired at time of CPO purchase, CPO Limited Warranty coverage continues for 12 months with no mileage limitation."

89.     The coverage terms of the CPO Limited Warranty are similar to the terms of the New Vehicle Limited Warranty.

90.     Unlike many car companies, VW does not make its owners' manuals

and warranty booklets available online prior to purchase. In order to access such materials on VW's websites, a consumer needs a Vehicle Identification Number. As such, the full warranty terms are presented to Plaintiffs and consumers after the purchase, on a take-it-or-leave-it basis.

### VW Had Superior and Exclusive Knowledge of the Defect

91. Since 2017, VW has designed, manufactured, distributed, sold, and leased the Class Vehicles. Because VW has extensive knowledge about the importance of the gateway control module and particularly robust pre-production and pre-sale testing of new models, VW knew about the Defect prior to the sale of the Class Vehicles.

92. VW had superior and exclusive knowledge of the Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

93. Well before Plaintiffs' purchases of their vehicles, VW knew about the Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to VW and its dealers, testing conducted in response to those consumer complaints, high failure rates of the gateway control modules, the data demonstrating the inordinately high volume of replacement part sales, other aggregate data from VW dealers about the problem, complaints made to NHTSA, communications from automobile safety regulators about the gateway

control module's vulnerability, and its own internal investigations as a result of these complaints and communications.

94.    VW is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, VW conducts tests, including pre-sale durability testing, on incoming components as well as on its own assembly process to verify the vehicles are free from defect and align with VW's specifications.[5] Thus, VW knew or should have known  that the Defect was prone to put drivers in a dangerous position due to the inherent risk of the Defect.

95.    Specifically, VW's preproduction testing includes extensive road testing at its proving grounds in Ehra-Lessien, Germany.  There, testing includes materials testing as well as rigorous review of its assembly procedures. VW is known to spend more for research and development than any other major vehicle manufacturer in the world and produces far more pre-production vehicles.[6]  In fact, VW even mistakenly once sold nearly 7,000 pre-production models, which were meant to be destroyed, to consumers.[7]  The pre-production testing and quality

---

[5] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed June 5, 2019).
[6] Christiaan Hetzner, *Inside Volkswagen's secret Ehra-Lessien proving grounds*, AUTOWEEK.COM, https://www.autoweek.com/news/technology/a1828046/volkswagens-secret-ehra-lessien-proving-grounds/ (last viewed April 19, 2021).
[7] Kyle Hyatt, *VW sold at least 6,700 preproduction cars to consumers and that's*

control audits on the 2018 model year Class Vehicles revealed the Defect to VW.

96.    Additionally, Defendants should have learned of this widespread defect from the sheer number of reports received from dealerships. VW's customer relations department, which interacts with individual dealerships to identify potential common defects, received numerous reports regarding the Defect. VW's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

97.    VWGoA's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is VWGoA's policy that when a repair is made under warranty the dealership must provide VWGoA with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed. As a result of analyzing the requests for warranty repairs, Defendants would have learned about the ongoing nature of the Defect, particularly that many times

---

*not good*, CNET.com, https://www.cnet.com/roadshow/news/vw-preproduction-test-cars-sold-to-public/ (last viewed April 20, 2021)

consumers did not report any spill in the backseat that could have caused the gateway module to become wet.

98.    Federal law requires automakers like VW to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, such as field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

99.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id.* Thus, VW knew or should have known of the many complaints about the Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, VW to the Defect as early as 2018.

100.    With respect solely to the Class Vehicles, the foregoing excerpts of owner incident reports are but a few examples of the many complaints concerning the Defect which are available through NHTSA's website, www.NHTSA.gov. Many of the complaints reveal that VW, through its network of dealers and repair

technicians, had been made aware of the Defect. In addition, the complaints indicate that despite having knowledge of the Defect and even armed with knowledge of the exact vehicles affected, VW often refused to diagnose the defect, provide warnings to consumers about the Defect, or otherwise attempt to repair it at all. When VW did attempt repairs under "goodwill", it merely replaced the gateway control module without modifying the vehicles to add protection to the compartment where the module resided.

101.  On August 19, 2020, a class vehicle driver reported the following incident dated July 20, 2020:

> CAR SUDDENLY TIED [sic] WHILE DRIVING IN CITY; ENGINE/ALL SYSTEMS SHUT OFF. IT TOOK SEVERAL HOURS FOR ROADSIDE ASSISTANCE TO ARRIVE, AND THE 1ST 2 TOWING COMPANIES COULD NOT DISENGAGE THE BRAKING SYSTEM TO LOAD ONTO TRUCK! ONCE VEHICLE TOWED TO AUDI DEALER, THEIR DIAGNOSIS WAS "GATEWAY CONTROL MODULE J533, WATER IN CONTROL MODULE, CORROSION IN CONNECTOR, CAUSING FUSE FOR GATEWAY CONTROL UNIT TO BLOW" WE WERE TOLD BY DEALER THAT "LIQUID MUST HAVE SPILLED INTO AREA BEHIND REAR SEATS." WE HAVE NO YOUNG CHILDREN, AND NOBODY WAS RECENTLY SITTING IN REAR SEAT. VEHICLE IS PARKED IN GARAGE AND IS EXCELLENT CONDITION; 2 YEARS OLD / 24,000 MILES. THIS WAS A $3,200 REPAIR NOT COVERED UNDER WARRANTY. THIS SOUNDS LIKE A DESIGN DEFECT.  AFTER SEVERAL COMMUNICATIONS I HAD WITH AUDI USA AND LOCAL DEALER, THOSE (2) PARTIES ME THIS REPAIR WOULD BE COVERED AS A "GOODWILL ADJUSTMENT" NOT A "WARRANTY ITEM". I FOUND SIMILAR REPORTS ONLINE: HERE IS DISCUSSION I STARTED ON AN ONLINE FORUM:

HTTPS://WWW.AUDIWORLD.COM/FORUMS/Q5-SQ5-MKII-DISCUSSION-218/CONTROL-MODULE-RUINED-MOISTURE-CORROSION-3001605/PAGE3/ ANOTHER ONE I FOUND: HTTPS://WWW.AUDIWORLD.COM/FORUMS/Q5-SQ5-MKII-DISCUSSION-218/COMPLETE-ENGINE-CONTROL-MODULE-FAILURE-2952745/ ATTACHED IS INVOICE. SYSTEM WILL NOT ALLOW ME TO UPLOAD PHOTOS THEY SENT ME DUE TO FILE SIZES. REPAIR TOOK ALMOST A MONTH TO COMPLETE. WE ENDED UP RENTING A CAR FOR A WEEK-LONG ROAD TRIP AS THE DEALER LOANER IS ONLY FOR LOCAL USE.

102. On January 6, 2021, a class vehicle driver reported the following incident dated December 21, 2020:

Q5 HAS A VERY SERIOUS DEFECT, THAT IS, THERE IS A GATEWAY MODULE LOCATED UNDER THE REAR SEAT CUSHION/CUP HOLDER. ALL OF THE COMMUNICATIONS TO ALL THE CONTROLLERS GO THROUGH THIS LITTLE BOX. IF WATER SPILLS, IT COLLECTS AROUND THE GATEWAY AND CORRODES IT, WHICH WILL SHUT DOWN THE CAR. THIS SHUTDOWN OCCURRED WHILE I WAS DRIVING MY FAMILY. LOST ALL POWER, ENGINE, ELECTRICAL, EVERYTHING. BARELY COASTED OUT OF THE ROADWAY. THIS IS A DESIGN FLAW TO LOCATE THIS SENSITIVE MODULE UNDERNEATH REAR CUP HOLDERS AND WILL LEAD TO DANGEROUS SITUATIONS FOR PEOPLE IN THE CAR.

103. On July 10, 2021, a class vehicle driver reported the following incident dated June 27, 2021:

I leased a 2021 Audi Q5 (VIN: WA1BAAFY7M2[XXX]) in November 2020. 2021 Audi Q5 has gateway module underneath the middle row seat. The gateway module is like the brain of the car and if it stops working the car stops - basically the car is brain dead. In my case, I was driving the car with my family i.e. wife, 7 and 3 year old kids when the car abruptly shut off. Luckily, I was on a road with 45 MPH speed limit and no traffic, so nothing happened to us. If this happened on a highway or other situation anything could have happened to me and my family. After safely

parking the car and getting it towed to Audi Westmont, the car was inspected, and I was informed about the gateway module issue. To my shock, the mechanic said that it's a design flaw that Audi is aware of but doesn't have a solution yet. Furthermore, he said that just at Laurel Audi in Westmont 4 cars were repaired for this problem. When I googled, several Audi owners have faced this problem. As I mentioned earlier, despite knowing the issue Audi didn't inform the owners and yet to inform the owners despite this being a serious enough problem that could put owners/families in a life threatening situation. Here's the link to the video taken during the diagnosis of the problem: https://asr.autonation.com/tV0Ij5Ym5c. I have also attached picture of the hodgepodge fix i.e. wrapping gateway module in plastic. The reason I say it is hodgepodge is that wrapping in plastic won't prevent water from condensing on gateway module and the problem repeating. Preceding the days my car had this problem, there were heavy rains and humidity was very high, as noted in the video there is no source of water leak or water entering the gateway module externally, given that finding and the fact that there was heavy rains, high humidity in the preceding days - condensation can likely be the potential cause of the problem. There are thousands of 2021 Audi Q5's and every single one has this risk. PARTS OF THIS DOCUMENT HAVE BEEN REDACTED TO PROTECT PERSONALLY IDENTIFIABLE INFORMATION PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6).

104.    On September 11, 2021, a class vehicle driver reported the following

incident dated September 7, 2021:

The 2021Audi Q5 has a gateway module under the middle back seat. Any fluid that contacts this module will cause it to fail shutting the car down completely. In addition, immediately above the module are 2 drink car holders. It only takes a small amount of spilled drink to cause this to happen. This happened to me on Sept. 7 causing my car to come to a complete stop immediately after passing thru and intersection. Eventually this will get someone killed or seriously injured. Audi has been aware of this issue but they don't inform potential buyers. This has happened numerous times before and I have attached other incidents posted on the internet. Please take action to make Audi take responsibility and corrective action. Electrical System problem #1 On August 19th, we drove our Audi through heavy

rain early in the day on interstate 90 to go to mass general hospital. It was then parked in their covered parking garage. When we went to return home, we were on the entrance ramp to I 90 east and suddenly the car displayed messages of brake failure, electrical failure, steering failure, and then it died. It could not even be put in park. I was able to coast to the narrow shoulder. It was towed to brookline Audi. We are told by the service technician that the gateway module in the vehicle got wet and it is our responsibility as we drove through water. Although we certainly drove in pouring rain, we never drove through any flooded areas. The apparent fact that water somehow got into this new car and shorted out this all important device is terrifying. Electrical System problem #2 Driver was with 2 passengers (3 young females) driving in a new 2021 Audi Q5 (less than 5 months old and less than 6000 miles) at about 70 mph on garden state parkway in NJ. A brake malfunction warning light appeared on the dashboard and within 5 seconds the car completely shut down in the middle lane of the parkway (in a black car at 10pm). This was the first notification or warning—nothin

105. On June 29, 2021, a class vehicle driver reported the following incident dated June 23, 2021:

The 2nd generation Audi Q5 (roughly 2017-2021+) has a major susceptibility to immediate, catastrophic failure as evidenced from my own experience and dozens of episodes reported online. This failure typically causes a $2000-$3000 repair bill that Audi will not cover and will claim is the fault of the owner. My wife was driving the vehicle with our 5-year-old daughter in the car In the middle of the rear seat. The daughter spilled part of a 500 ml water bottle onto the seat next to her. Within 20 seconds of this happening, the car began alerting about steering malfunctions, braking malfunctions, and the windows began seizing up and down repeatedly. The car was completely inoperable. We are lucky this was on a slow city street and not on the interstate or tollway! Once stopped, we no buttons generated any actions from the vehicle. we couldn't power it on, put it into neutral to be towed away, raise the windows, or perform ANY other function at all. The car was a useless brick. We were charged $125 for the towing service and another $2200 from Audi Plano in Texas. After countless conversations, even debates, with David (director Audi Plano) and even Audi USA customer experience team, they REFUSED to admit any fault in

a poor design and help cover any of the costs whatsoever, and we are even still in warranty. The part that was damaged is DIRECTLY below the cupholders and has no effective liquid protections - what did they think would happen! Here are other examples from online: https://www.audiworld.com/forums/q5-sq5-mkii-discussion-218/water-bottle-leak-%241800-damage-3009540/  https://www.audiworld.com/forums/q5-sq5-mkii-discussion-218/control-module-ruined-moisture-corrsion  -  3001605/page5/

https://www.mumsnet.com/Talk/shopping/3641294-Audi-Q5-taken-out-by-DD-water-spill-in-rear-seat

https://www.nhtsa.gov/recalls?nhtsaId=11350209

106.    On June 26, 2021, a class vehicle driver reported the following incident dated May 8, 2021:

Water was spilled in the backseat of the car (less than 12 ounces of water). This caused a complete electrical failure impacting the engine and power steering. The failure happened at a slow speed in a parking lot but would have been much more dangerous on highway. The car would not turn on or off and would not shift into any gear after coming to a stop. Was told that the water caused a failure in the data bus control module.

107.    On July 23, 2021, a class vehicle driver reported the following incident dated July 16, 2021:

The incident occurred on a busy road during evening rush hour. I was in the middle lane of three lanes, and the lane to the right of me was closed due to construction. The phrase "electrical malfunction" flashed across my dashboard, there were beeping sounds, and about 5-10 later the steering froze up and the car would no longer accelerate. There were no other prior warning indications. I was unable to steer over on a side road or shoulder. I blocked traffic in the middle lane. My 1-and-a-half-year-old was in the back seat with me, and I was 35 weeks pregnant at the time. The temperature was 104 outside and my car wouldn't start despite several trouble shooting attempts to turn it back on. The car kept beeping and flashing malfunction signals on the dashboard indicating that all the different safety functions were not functioning. The windows were inoperable as well and would randomly go up and down. The vehicle was towed to the dealership, and they determined the J533 Gateway

37

> Module needed to be replaced. This module is located underneath the back row in a tub-like recess, which had collected water, and the module had malfunctioned. It is unknown if the module is available for inspection upon request.

108.   In addition to VW's review of NHTSA complaints, discovery will show that VW's internal consumer relations department and/or online reputation management services routinely monitor the internet for complaints about its products, including complaints posted on consumer forums and other social media websites including Twitter and Reddit. The fact that so many customers made similar complaints put VW on notice of the Defect, as well as its severity.

109.   On December 21, 2020, a class vehicle driver reported the following incident on audiworld.com:[8]

> Hi All,
>
> My wife and I just bought a 2021 Q5. A few weeks after purchase, we had some electrical problems that caused the car to shut down. It turns out that my 8 year old spilled some water in the back seat form her water bottle that leak underneath the seat. It shorted out a control module. According to the tech, they have to get the part from Germany and it will be $1800 to repair. I'm wondering what my recourse is. In a "family" suv where kids will be in the back seat, you would expect better protection of critical components, correct? It wasn't like a hose was left on in the car, probably about a cup of water or so. Any advice?

---

[8] https://www.audiworld.com/forums/q5-sq5-mkii-discussion-218/water-bottle-leak-%241800-damage-3009540/

Thanks!

110.    On August 2, 2020, a driver in China reported the following incident on an online forum:[9]

> Hello,
>
> I am an Audi owner from Shanghai, China.
>
> Today, I would like to ask a question for my friends who have AUDI Q5 2018, which has an extra 88 cm for wheelbase and started selling in the end of 2018 in mainland China, and we call it Q5L.
>
> Q5L has a very serious defect, that is, there is a gateway under the rear seat cushion, just under the cup holder. But there is no any waterproof measures for the gateway, and there is no any safety warning in the instruction book too. There are already many cases of Q5L's gateway spilled water in China because children drank water carelessly on the rear seat since 2019.
>
> When water leaks through the safety belt lock gaps, the gateway is very easy to be watered and burn down and then the Q5L will completely collapse and can not be restarted. It will cost 12,000 RMB (about 1450 euros) to replace with a new gateway in 4S shops, but the new gateway still has no any waterproof measures. There is no any improvement after the Q5L owners complained to Audi China.I am doing this for my friends just because I can write a little in English.
>
> What we want to know is,
>
> 1. Is there a gateway under the rear seat cushion in your Q5 (2018) if you are out of china?
>
> 2. Is it reasonable to place the gateway under the rear seat, just below the cup holder?Should it be recalled by Audi ?
>
> 3. If there is no recall, how should the car owners take waterproof measures?
>
> 4. could you please give us some suggestion for us to solve this problem?
> Sorry, i am a new register, it seems i have no the authority to upload photos about the defect.

---

[9] https://www.audiworld.com/forums/q5-sq5-mkii-discussion-218/gateway-under-rear-seat-cushion-very-easy-watered-burn-down-3002613/

Thank you so much.

LYU.

111.    On July 17, 2021, a class vehicle driver reported the following incident

on an online forum:[10]

> 2021 Audi Q5 has a MAJOR design flaw and a SIGNFICANT
> SAFETY ISSUE that Audi is fully aware of, doesn't have a fix
> yet, so haven't issued a recall or informed exiting owners.
> What's worse is that they are still selling the car without
> disclosing the problem to prospective owners. If you or your
> loved ones are considering buying 2021 Audi Q5 – PLEASE
> STOP & read this. If you already own an 2021 Audi Q5 –
> PLEASE STOP DRIVING IT IMMEDIATELY AND
> CONTACT THE MANUFACTURER AND YOUR DEALER
> IMMEDIATELY. Read my post below for further details. 2021
> Audi Q5 has gateway module (part # J533) under the middle
> row seat, right below the cup holder. Gateway module is like
> the brain of the car and when it stops working, the car shuts off
> immediately. It is exactly like a brain dead person, everything
> stops working, the car remote keys won't work, engine won't
> start and so on. If water gets in the gateway module it stops
> working immediately and yes, right then and there – you can be
> on a highway at 70 MPH speed, making a left turn at the red
> light when there is car approaching you in distance … etc., it
> just stops. I was driving the car after heavy rains and that's
> exactly what happened to me – the car totally shut off in the
> middle of the road, thankfully we are all safe and unhurt. My
> car was towed to the service center and since they don't have a
> permanent fix to the problem, they have wrapped the gateway
> module in plastic – see pictures. I asked them to confirm in
> writing that the fix is permanent and it prevents water entering
> the gateway module and they said that they can't confirm it in
> writing. So I asked to take the car back and refund the money
> in full. It has been 3 weeks and after multiple reminders I have
> received a generic email asking for a list of irrelevant
> documents or documents they already have access to. Email
> says that they will take 2 or more weeks to review and get back
> to me with a resolution. Well, it's a safety issue and anything
> can happen if I drive the car, so I didn't pick up the car, paying

---

[10] https://www.edmunds.com/audi/q5/2021/consumer-reviews/

the EMI, have no loaner and Audi is just not taking the issue seriously. They are still selling the defective car without informing the buyers. @skeogh @audi @danielweissland #audi #quatro #audiq5 #audiusa #audiwestmont www.audiusa.com www.audiwestmont.com .– take the defective car back and refund my money. This is no rocket science, you are fully aware of the problem. Save lives! Please tag 2021 Audi Q5 Owners, please tag your friends who are in the market to buy a new SUV and considering Audi Q5.

112. On August 31, 2021, a class vehicle driver reported the following incident on an online forum:[11]

I just had this happen to me as well. Brand new 2021 Q5. My kids were in backseat and spilled literally half a cup of water over the cup holders. About 5 mins later the whole car lit up like a Christmas tree; every warning/error message appears. Car shut off completely, windows rolled down. Suddenly I was sitting dead on the road and car won't start, won't move. I was absolutely shocked. Thankfully we we'ren't on a busy street and so waiting for the tow truck for 2 hours wasn't an issue.

A day later, Audi contacts me and says because the damage was done by water spilling, it won't be covered under Audi Care or the Warranty, but it would under my own insurance. I was lucky enough to come across this blog and read through some other posts. I contacted the dealer and said that I was reporting the design defect to Transport Canada recall unit. Within minutes the dealer contacted me back and said they just spoke wtih Audi Canada and that Audi would cover the cost of the replacement          no          questions          asked.

That was reassuring, but I am honestly looking for a solution to this problem rather than a free fix. I still reported it to transport Canada. I will report back here

---

[11] https://www.audiworld.com/forums/audi-a5-s5-rs5-coupe-cabrio-b9-220/anyone-get-letter-about-service-action-90m3-gateway-control-module-2973560/

> what I find out from them, if anything.
>
> Audi dealer mentioned that Audi Canada is looking for a solution/fix but there is nothing yet definite.
>
> Wow, common sense, Audi - recall the vehicle and get it fixed before we all take you to court! Heaven sakes, if that breakdown happened on a busy highway, there is no telling what could have happened to me and my family

113.    On August 10. 2021, a driver in the United Kingdom reported the following incident on an online forum:[12]

> I have just had this fail on my 2 month old Q5 after my daughter spilt a (very small) drink on the back seat. We were driving on a country road when it failed and thankfully managed to stop the car on some grass after a complete power failure.
>
> I am currently in a dispute as Audi UK claim this is an external factor, however I say it is a dangerous design flaw. I am in the process of rejecting the car and think as many people as possible need to raise this quickly. I genuinely think this could cause death or serious injury if the car were to fail at high speed.
>
> Diagnostics video is here if anyone is interested – https://audicam.audi.co.uk/preview/4...72fac8d983ac65

114.    On July 18, 2019, a class vehicle driver reported the following incident on an online forum:[13]

> Dear all!
>
> I leased a brand new Q5 back in April this year and last week my 7 year old DD spilled water from her water bottle in the rear seats.
>
> The next day as my husband was taking the kids to running club the car started flashing up errors and died.

---

[12]https://www.audiworld.com/forums/q5-sq5-mkii-discussion-218/control-module-ruined-moisture-corrosion-3001605/page6/
[13]https://www.mumsnet.com/Talk/shopping/3641294-Audi-Q5-taken-out-by-DD-water-spill-in-rear-seat

We called Audi and the engineer confirmed that the brain of the car is located under the rear seats and the water had gotten into the unit, therefore taking out the electrics of the car.
Is it me or is this a design issue?

What if the malfunction had occurred while were were in motion?

Is under the rear seats the right place for electrical components given the car is targeted at families and spills can and do happen?

We have been left with a heavy bill to rectify the issue and really don't understand how this design hasn't been raised as a safety issue in the past.

There is no warning or sign stating water should not be consumed in vehicle due to design - we would not have selected this vehicle if we had known.

Any similar experiences out there? As we are concerned by what could have potentially happened if the car had been in motion.

115.    VW was also made aware of the Defect due to previous investigations in response to problems with the gateway control module.  First, earlier models of Audi vehicles in the 2000s had the module in the floor of vehicle in the front.  When the drains from the air conditioning unit or the drains from sunroofs in these vehicles became clogged, the front floor of the vehicle would flood and destroy the gateway control module.  As a result, VW changed the design so that the gateway control module would be higher up in the dashboard, closer to the steering column.

116.    Second, VW issued a Technical Service Bulletin ("TSB") to address connectivity issues with the gateway control module on June 15, 2020.  The bulletin described a condition in which one could not start the vehicle after a gateway control

module reset, which would occur after the installation of a new gateway module. The investigation that led to the issuance of this TSB was likely prompted in part by the many gateway control modules that had to be reset or replaced due to the Defect.

117.  A significant portion of VW's technical instructions to dealerships are only available on proprietary VW software and systems.  Dealership technicians are instructed by VWGoA-given trainings how to use this software, which provides guided, step-by-step instructions on diagnosing, repairing, and communicating with consumers about problems with their vehicles.  Technicians at Audi dealerships are also routinely instructed to open Technical Assistance Center ("TAC") cases with VWGoA regarding certain repairs and to follow the instructions given by VWGoA. As a result, discovery will show that that VWGoA has numerous cases in its records showing consumer and dealer complaints about gateway control module failures due to moisture.  Indeed, the Defect is a well-known problem with the Class Vehicles at Audi dealerships and frequently discussed by technicians.

118.  Further, in December 2021, VW announced it would recall 2018 through 2021 Audi Q5 vehicles.  The recall is scheduled to begin February 24, 2022. According to the chronology filed by VWGoA, as the designated agent of Audi AG to provide information to NHTSA, VW was contacted by Chinese automobile safety regulators in August 2020 regarding many reports of gateway control module failure due to moisture.  VW began an investigation immediately.

119. Per VWGoA's submission to NHTSA however downplayed the seriousness of the Defect:

> The analysis revealed that in case of a liquid ingress, the gateway control module goes into a failsafe mode as part of the safety concept in order to avoid unwanted vehicle reactions. Audi performed a safety assessment to evaluate the potential conditions and consequences that could result from a power shutdown of the gateway control module due to liquid ingress. As part of the investigation, a potential solution for the field and in production was tasked, developed and tested. Audi also conducted a risk assessment which indicated that the risk of a liquid spill leading to a failure of the gateway control module is very low and rare over the lifetime of the vehicle. This was confirmed by the field situation at the time. At the time there were only isolated cases in the North American region and all of them happened after an outside influence, mostly after a beverage spill. Audi continued to monitor the field worldwide regarding this topic.

120. VW describes the defect in the recall, present in 288,991 vehicles, as:

> If liquid reaches and enters the gateway control module, mostly due to a liquid spill on the rear seats, it is being switched off as part of the safety concept. In very rare cases (such as when driving through heavy rain or deep water) there may also be water ingress through an insufficient underbody seam. Water/ liquid ingress into the gateway control module may lead to various internal errors due to short circuits within the control unit. The gateway control module has a safety concept in case implausible signals are detected in the control unit. If such implausible signals are detected, the gateway switches off its function in order to avoid unwanted vehicle reactions.

121. The remedy offered on the recall is described as follows:

> At no cost to customers, Audi dealers will install a protective cover for the gateway control module which will protect the part from liquid ingress. In addition, on vehicles produced until end of August 2021, the dealer will also seal the insufficient underbody seam. **Audi will not offer a reimbursement program under this recall.**[14]

---

[14] https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V947-1766.PDF (emphasis added)

122.   Despite the fact that VW now recognizes this as a defect, VW has made the decision not to provide any consumer who was forced to pay for repairs with any reimbursement.

123.   Further, the "protective cover" VW intends to install on some, but not all the Class Vehicles, is a plastic bag.   As shown in the picture below[15], the "protective cover" is hardly a sufficient remedy because the plastic bag can and will allow condensation to accumulate on the interior and disrupt the functioning of the gateway control module.

A NEW Q5 OWNER IN CHINA TOOK HIS CAR LAST WEEK (PRODUCT DATE 🌐EC 6TH ) AND [size=13px]UNVEILED[/size] ITS **GATEWAY** AND PRESENT THIS PHOTO.



124.   The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

---

[15] https://www.audiworld.com/forums/q5-sq5-mkii-discussion-218/cn-hello-all-merry-christmas-just-show-gateway-water-proof-treatment-audi-3031398/

125.    Reasonable consumers, like Plaintiffs, expect that a vehicle will be able to function in rain or high humidity, or if a small spill occurs in the vehicle's backseat, the car should still function in a manner that will not pose a safety risk and is free from defects. Plaintiffs and Class Members further reasonably expect that VW will not sell or lease vehicles with known safety defects, such as the Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect VW to conceal and fail to disclose the Defect to them, and to then continually deny its existence.

## VW Has Actively Concealed the Defect

126.    Despite its knowledge of the Defect in the Class Vehicles, VW actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, VW failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

> (a)    any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining the compartment in which the gateway control module resides;

> (b)    that the Class Vehicles were not in good in working order, were defective, and were not fit for their intended purposes, particularly driving in rain; and

(c)    that the Class Vehicles were defective, despite the fact that VW learned of such defects as early as early 2017.

127.    Despite knowing of the extreme vulnerability of the Class Vehicles to be damaged by water, VW provided no warning to Plaintiffs and Class Members before or after their purchases and/or leases that the Class Vehicles should not be driven during inclement weather and that no beverages of any kind should be placed anywhere in proximity to the back seat.  Instead, VW installed cup holders directly over the area in which the gateway control module resides, implicitly telling Plaintiffs and Class Members that liquids could be transported safety in the back seat of the vehicle.  Indeed, no reasonable consumer believes that a minor spill of water on the back seat of their vehicle would have the capacity to completely shutdown the vehicle.  Similarly, no reasonable consumer would expect that a vehicle would be sold if there was a possibility that running over a shallow rain puddle would be all that is required for water to penetrate the vehicle and destroy the gateway control module.

128.    When consumers present their Class Vehicles to an authorized VW dealer for repairs related to the gateway control module getting wet, rather than repair the problem under warranty, VW dealers were instructed by VW to inform consumers that their vehicles were damaged by the fault of the consumers and that such damage is not covered under warranty, even when the consumer did not

48

transport any liquids in the interior of their vehicle. In this manner, VW avoids paying for warranty repairs and unlawfully transfers the cost of the Defect to Plaintiffs and other consumers.

129. Moreover, despite receiving warranty repair requests since 2018, selling an unusual quantity of replacement gateway control modules, receiving unusual numbers of complaints through its dealerships, directly through customer service hotlines, and through NHTSA, and even being contacted by Chinese automobile safety regulators in August 2020, VW continued to produce and distribute the Class Vehicles without providing any warnings as to their vulnerability to being damaged by water. VW continued to conceal the fact that the vehicles were unsafe even after it launched its own internal investigation.

130. VW has also confined its internal investigation and subsequent recall of the vehicles to the 2018 through 2022 Audi Q5, its most popular model, in an effort to limit the costs of the recall. Further, despite issuing notice of the recall to dealerships, scheduling to begin in February 2022, VW has not announced that it intends to refund the monies of anyone who was forced to pay for repairs out of pocket, such as Plaintiff Gioffe.

131. Further, rather than issue a TSB that specifically addresses the Defect and acknowledges that such repairs should be covered under warranty, a copy of which VW is required to file with NHTSA, VW has instead kept information

regarding the Defect in its proprietary Offboard Diagnostic Information System ("ODIS"). ODIS, as well as other proprietary software, provides dealership technicians with guided, step-by-step instructions on diagnosis and repair. These systems contain information about the Defect, or otherwise inform technicians to contact VWGoA directly via TAC cases for acknowledged defects. ODIS and the other proprietary systems are not accessible to Plaintiffs or the general public.

132. Further, the information submitted by VW to NHTSA in the recall is not entirely accurate. VW stated in the recall materials that:

> The vehicle remains steerable and the brake system is fully operable. The engine goes into emergency mode and remains in operation with reduced power. Unexpected reduced engine power may create an increased risk of an accident in certain driving situations.

This is not true. VW issued a TSB entitled "No diagnostics communication to the telematics control module" on November 9, 2020 that warns that "The vehicle is not able to be moved under its own power while J533 is without power."

133. Moreover, as described by Plaintiffs and Class Members, when the J533 module is wet, the vehicle can shut down completely, cannot be steered and that the brakes may not engage or may remain engaged regardless of any commands.

134. VW has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' gateway control module, despite VW's knowledge of the Defect.

**The Agency Relationship between Volkswagen Group of America, Inc. d/b/a**

### Audi of America and its Network of Authorized Dealerships

135.   In order to sell vehicles to the general public, VWGoA enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new VW or Audi-branded vehicles, the authorized dealerships are also permitted under these agreements with VWGoA to service and repair these vehicles under the warranties VWGoA provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, VWGoA's authorized dealerships are VWGoA's agents, and the consumers who purchase or lease VWGoA vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their VWGoA vehicles locally. Because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

136.   Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of VWGoA's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by VWGoA. VWGoA's warranties were

designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of VWGoA's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

137. VWGoA issued the express warranty to the Plaintiffs and the Class members. VWGoA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. VWGoA also is responsible for the content of the Monroney Stickers on Audi-branded vehicles. Because VWGoA issues the express warranty directly to the consumers, the consumers are in direct privity with VWGoA with respect to the warranties.

138. In promoting, selling, and repairing its defective vehicles, VWGoA acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive VWGoA representatives and agents. That the dealers act as VWGoA's agents is demonstrated by the following facts:

(a) The authorized Audi dealerships complete all service and repair according to VWGoA's instructions, which VWGoA issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents;

(b) Technicians at Audi dealerships are required to go to at least yearly VWGoA-given trainings in order to remain certified to work on Audi-branded vehicles, at which they receive training

on VW-proprietary systems such as the ODIS which provides guided, step-by-step instructions on diagnosing and repairing Audi-branded vehicles;

(c)     Consumers are able to receive services under VWGoA's issued New Vehicle Limited Warranty only at VWGoA's authorized dealerships, and they are able to receive these services because of the agreements between VWGoA and the authorized dealers. These agreements provide VWGoA with a significant amount of control over the actions of the authorized dealerships;

(d)     The warranties provided by VWGoA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)     VWGoA dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(f)     VWGoA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, particularly through directed step-by-step ODIS instructions, and the dealerships are able to perform repairs under warranty only with VWGoA's authorization.

(g)     VWGoA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising; and

(h)     VWGoA implemented its express and implied warranties as

they relate to the defects alleged herein by instructing authorized VWGoA dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

139.    Indeed, VWGoA's warranty booklets make it abundantly clear that VWGoA's authorized dealerships are its agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at their "authorized Audi dealer." For example, the warranty booklets state, "[a]ny authorized Audi dealership in the United States, including its territories, will honor this warranty." Further, the warranty "only applies to vehicles or parts and accessories that are imported or distributed by Audi, and vehicles original sold by an authorized Audi dealer in the United States, including its territories." Under the terms of the warranty repairs will be provided by "[y]our Audi dealer." The booklets direct Plaintiffs and class members, should they have a problem or concern, to "discuss them first with management personnel at your authorized Audi dealership. In the event your dealership does not respond to your satisfaction, Audi offers additional assistance. You may contact the Audi Customer Experience Center via telephone or mail as well as email, chat, Twitter, and Facebook…A Customer Advocate, in conjunction

with authorized Audi dealer, will work with you to gather and review all the facts relating to your concern."

140.   Further, VWGoA d/b/a Audi of America also offers certain "complimentary services," including a pre-delivery inspection and the first maintenance on the vehicle free of charge.  Both of these services are actually completed by "your authorized dealer."  For example, "[p]rior to delivery, your authorized Audi dealer completed an extensive and detailed inspection of your vehicle."  Further, consumers are directed to "contact your authorized Audi dealer to schedule" their complimentary first service.

141.   Moreover, as noted by VWGoA on its website describing the Audi Certified Pre-Owned program, the vehicles are actually inspected and certified by technicians at authorized dealerships.  In touting its "300+ Point Dealer Inspection," VWGoA states, "[o]nly once the vehicle passes a detailed dealer inspection does it earn the right to be part of the Audi Certified pre-owned program."[16] As such, authorized Audi dealerships inspect used vehicles on VWGoA's behalf and the dealer's certification of quality of these vehicles is sufficient under standards published by VWGoA that is enough to bind VWGoA to the more generous warranty terms of the Certified Pre-Owned Warranty. As stated on the website, "only

---

[16] *See* https://www.audiusa.com/us/web/en/shopping-tools/certified-pre-owned.html (last visited July 15, 2021).

after this exhaustive dealer inspection are we confident in backing the vehicle with our Audi Certified pre-owned Limited Warranty."[17] Moreover, the website also states that such vehicles are "rigorously inspected by Audi trained technicians to ensure each Audi Certified pre-owned vehicle is in optimal condition."[18]

142.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of VWGoA. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either VWGoA or its agent dealerships to establish privity of contract between VWGoA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and VWGoA.

### VW Has Unjustly Retained A Substantial Benefit

143.    Defendants unlawfully failed to disclose the Defect to induce Plaintiff and other Class Members to purchase or lease the Class Vehicles.

144.    Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

145.    Defendants unlawfully induced Plaintiffs and class members to purchase their respective Class Vehicles by concealing a material fact (the Defect).

---

[17] *Id.*

[18] *Id.*

Had Plaintiffs and class members known of the subject defect, they would have paid less for the Class Vehicles or would or not have purchased them at all.

146. Accordingly, VW's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

## CLASS ACTION ALLEGATIONS

147. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

148. The Class and Sub-Class are defined as:

**Class**: All individuals in the United States who purchased or leased any 2012-2017 Audi vehicle equipped with the 2.0-liter turbocharged engines ("Class Vehicles.")

**Connecticut Sub-Class**: All members of the Class who purchased a Class Vehicle in the State of Connecticut.

**Florida Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of Florida.

**Illinois Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of Illinois.

149. Excluded from the Class and Sub-Classes are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal

representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

150. Numerosity:  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is easily in the thousands and thus significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

151. Typicality:  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by VW. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the gateway control module.

Furthermore, the factual bases of VW's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

152.   Commonality:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

     (a)    Whether Class Vehicles suffer from defects relating to the ability of liquid to easily reach the gateway control module;

     (b)    Whether the Defect constitutes an unreasonable safety risk;

     (c)    Whether Defendants knew about the Defect and, if so, how long Defendants have known of the defect;

     (d)    Whether the Defect constitutes a material fact;

     (e)    Whether Defendants have had an ongoing duty to disclose the Defect to Plaintiffs and Class Members;

     (f)    Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

     (g)    Whether Defendants knew or reasonably should have known of Defect before it sold and leased Class Vehicles to Class Members;

(h)    Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the Defect, including refunding any monies already paid for repairs;

(i)    Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace gateway control modules;

(j)    Whether VWGoA breached its express warranties under UCC section 2301;

(k)    Whether VWGoA breached its express warranty under the laws of Connecticut, Florida, and Illinois;

(l)    Whether Defendants breached their implied warranties under the laws of Connecticut, Florida, and Illinois; and

(m)    Whether Defendants breached the consumer protection laws of Connecticut, Florida, and Illinois.

153.    Adequate Representation:  Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

154.   Predominance and Superiority:  Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION
**Breach of Written Warranty Pursuant to the Magnuson-Moss Warranty Act**
**(On Behalf of Plaintiffs Gioffe, Anido, and Wurzelbacher individually against VWGoA)**

155. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

156. Plaintiffs bring this cause of action on behalf of themselves individually.

157.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(1).

158.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

159.    Defendant VWGoA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

160.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

161.    VWGoA provided Plaintiffs with an express warranty described *infra*, which became a material part of the bargain. Accordingly, this express warranty is an express warranty under Connecticut, Florida, and Illinois law and is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

162.    The gateway control module and its compartment were manufactured and/or installed in Plaintiffs' Vehicles by VW and are covered by the express warranty.

163.    In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty

further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

164.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

165.   VWGoA breached the express warranty by refusing to provide repairs under warranty for a known defect as described above.  Rather than repairing the vehicles pursuant to the express warranty, VWGoA made Plaintiffs pay for the repairs themselves or only offered a "goodwill" repair.  Moreover, the repairs provided by VWGoA's authorized agents were ineffective to permanently repair the Defect and Plaintiffs can reasonably expect the Defect to continue to cause their vehicles to unexpectedly shut down, even outside Plaintiffs' Vehicles' express warranty period, at which point VWGoA would deny any responsibility for repairing the Defect.

166.   Furthermore, VWGoA impliedly warranted that the Plaintiffs' Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Plaintiffs' Vehicles were manufactured, supplied, distributed, and/or sold by VWGoA and that the vehicles were safe and reliable for providing transportation; and (ii) a warranty that Plaintiffs'

Vehicles would be fit for their intended use while the Class Vehicles were being operated.

167. Contrary to the applicable implied warranties, Plaintiffs' Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purchase of providing Plaintiffs with reliable, durable, and safe transportation. Instead, Plaintiffs' Vehicles suffer from the Defect, which renders their vehicles unsafe and unable to provide reliable transportation.

168. VWGoA's breach of express and implied warranties had deprived Plaintiffs of the benefit of their bargain.

169. Plaintiffs have had sufficient direct dealings with VWGoA and its agents (dealerships and customer support personnel) to establish privity of contract between VWGoA, on one hand, and Plaintiffs, on the other hand. Furthermore, VWGoA provided warranties directly to Plaintiffs and Plaintiffs are the intended beneficiaries of VWGoA's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with  Plaintiffs' Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

170. Furthermore, privity is not required here because Plaintiffs are the intended third-party beneficiaries of contracts between VWGoA and its dealerships. These contracts give the dealerships the right to sell Audi-branded vehicles, as well

as service and perform warranty repairs on VWGoA's behalf.  Plaintiffs are the beneficiaries of these contracts because they are the intended end-consumers and users of the products VWGoA distributes to its authorized dealerships.  Plaintiffs also have the right to receive service and warranty work at dealerships located more conveniently to them that VWGoA's headquarters.

171.  The amount in controversy of Plaintiffs' individual claims meet or exceed the sum or value of $25.

172.  Plaintiffs were not required to notify VWGoA of its violations of the Magnuson-Moss Warranty Act and/or were excused from doing so because affording VWGoA a reasonable opportunity to cure its warranty breaches would have been futile.  VWGoA was also on notice of the Defect from the complaints and service requests it received from Plaintiffs, as well as other consumers with vehicles with the Defect, from repairs and/or replacements of the gateway control module, and through other internal sources.

173.  VWGoA has been afforded a reasonable opportunity to cure it warranty breaches, including when Plaintiffs brought their vehicles into authorized dealerships for diagnoses and repair.

174.  In addition, on December 3, 2021, Plaintiffs gave notice to VWGoA that they intended to pursue Magnuson-Moss Warranty claims.

175.   As a direct and proximate cause of VWGoA's violations of the Magnuson-Moss Warranty Act, Plaintiffs sustained damages and other losses in an amount to be determined at trial.  VWGoA's conduct damaged Plaintiffs, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

### SECOND CAUSE OF ACTION
**Violation of the Connecticut Unlawful Trade Practices Act**
**Conn. Gen. Stat. § 42-110A, *et seq*.**
**(On behalf of the Connecticut Sub-Class against all Defendants)**

176.   Plaintiff Meghan Gioffe ("Connecticut Plaintiff") incorporates by reference the allegations contained in paragraphs 1-146 of this Complaint.

177.   Connecticut Plaintiff brings this cause of action against Defendants individually and on behalf of the Connecticut Sub-Class

178.   Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts, or practices under the Connecticut Unlawful Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*. ("Connecticut UPTA").

179.   At all relevant times, Defendants were "persons" within the meaning Conn. Gen. Stat. § 42-110a(3).

180.   Defendants' conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the Connecticut UPTA.  Conn. Gen. Stat. § 42-110b(a).

181. VW participated in deceptive trade practices that violated the Connecticut UPTA as described herein. By failing to disclose and by concealing the Defect; by marketing the Class Vehicles as safe, reliable, functional, and of high quality; and by presenting itself as a reputable manufacturer that valued safety, performance, functionality, attention to detail, and reliability and which stood behind its vehicles after they were sold, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

182. VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others would rely upon such concealment, suppression, or omission, in connection with the sale or lease of the Class Vehicles.

183. VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

184. VW knew that the Class Vehicles suffered form an inherent defect, were defectively designed and/or manufactured, and were not suitable for intended use.

185.  VW knew or should have known that its conduct violated the Connecticut UTPA.

186.  VW was under a duty to disclose the Defect and its corresponding safety risk to Connecticut Plaintiff and the members of the Connecticut Sub-Class because:

(a)    VW was in a superior position to know the true state of facts about the Defect and its corresponding safety risk in the Class Vehicles;

(b)    VW made partial disclosures about the safety, reliability, functionality, attention to detail, and quality of the Class Vehicles without revealing the Defect and its corresponding safety risk; and

(c)    VW actively concealed the Defect and corresponding safety risk from Connecticut Plaintiff and the members of the Connecticut Sub-Class at the time of sale and thereafter, including when they sought repairs under the terms of their warranties.

187.  By failing to disclose the Defect, VW knowingly and intentionally concealed the material facts and breached their duty not to do so.

188.  The facts concealed and omitted by VW to Connecticut Plaintiff and the members of the Connecticut Sub-Class are material because a reasonable person would have considered them to be important in deciding whether or not to purchase

or lease the Class Vehicles, or to pay less for them. Whether a vehicle functions properly, can do so in inclement weather or if children spill water in the back seat without abruptly shutting down, is a material safety concern. Had Connecticut Plaintiff and the members of the Connecticut Sub-Class known that the Class Vehicles suffered from the Defect described here, they would have purchased or leased the Class Vehicles or would have paid less for them.

189.  The existence of the Defect and its corresponding safety risk were concealed and omitted by VW with the intent that Connecticut Plaintiff and members of the Connecticut Sub-Class rely on the concealment, suppression, and/or omission thereof.  Connecticut Plaintiff and members of the Connecticut Sub-Class, in fact, did rely on VW's concealment, suppression, and/or omission of the material of the existence of the Defect and its corresponding safety risk to their detriment.

190.  Connecticut Plaintiff and the members of the Connecticut Sub-Class are reasonable consumers who do not expect that their vehicles would suffer from the Defect, which is the reasonable and objective consumer expectation for vehicles.

191.  As a result of Defendants' misconduct, Connecticut Plaintiff and the members of the Connecticut Sub-Class have been harmed and have suffered actual damages in that the Class Vehicles are defective, that they have overpaid for the Class Vehicles, and that the Class Vehicles require repairs which VW refuses to provide.

192.   As a direct and proximate result of Defendants' unfair and/or deceptive acts or practices, Connecticut Plaintiff and the members of the Connecticut Sub-Class have suffered and will continue to suffer actual damages.

193.   Connecticut Plaintiff and the members of the Connecticut Sub-Class seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Connecticut UPTA, as well as an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other proper relief available under the Connecticut UPTA.

194.   Defendants acted with reckless indifference, wanton or intentional disregard of another's rights and/or safety, and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

**THIRD CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**(On Behalf of the Connecticut Sub-Class against all Defendants)**

195.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

196.   Connecticut Plaintiff brings this cause of action individually and on behalf of the Connecticut Sub-Class.

197.   At all relevant times, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

198.   Defendants provided Connecticut Plaintiff and the Connecticut Sub-Class Members with an implied warranty that the Class Vehicles were merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for the ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from a serious inherent defect at the time of sale and thereafter.

199.   Connecticut Plaintiff and the Connecticut Sub-Class were not required to notify VW of its breach of implied warranty and/or were excused from doing so because affording VW a reasonable opportunity to cure its breach of implied warranty would have been futile.  Defendants were also on notice of the Defect from the complaints and service requests they received from Class Members, from repairs and/or replacements of the gateway control module, and through other internal sources.

200.   Defendants have been afforded a reasonable opportunity to cure its breach, including when Connecticut Plaintiff and members of the Connecticut Sub-Class brought their vehicles in for diagnoses and repair of their vehicles.

201.   In addition, on December 3, 2021, Connecticut Plaintiff gave notice to VWGoA that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

202.   Because Connecticut Plaintiff purchased her vehicle from an authorized Audi dealership, she is in privity with Defendants.  Connecticut Plaintiff and members of the Connecticut Sub-Class have had sufficient direct dealings with VWGoA and its agents (dealerships and customer support personnel) to establish privity of contract between VWGoA, on one hand, and Connecticut Plaintiff and members of the Connecticut Sub-Class, on the other hand.  Furthermore, VWGoA provided warranties directly to Connecticut Plaintiff and members of the Connecticut Sub-Class therefore Connecticut Plaintiff and members of the Connecticut Sub-Class are the intended beneficiaries of VWGoA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.  VWGoA is also the agent of VWAG and Audi AG, designated by both to communicate with NHTSA regarding the safety of their vehicles.

203.   Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Sub-Class are the intended third-party beneficiaries of contracts between VWGoA and its dealerships.  These contracts give the

dealerships the right to sell Audi-branded vehicles, as well as service and perform warranty repairs on VWGoA's behalf. Connecticut Plaintiff and members of the Connecticut Sub-Class are the beneficiaries of these contracts because they are the intended end-consumers and users of the products VWGoA distributes to its authorized dealerships. Connecticut Plaintiff and members of the Connecticut Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than VWGoA's headquarters

204.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, properly, and/or value of their Class Vehicles.

205.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty
### (On behalf of the Connecticut Sub-Class against VWGoA)

206.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

207.   Connecticut Plaintiff brings this cause of action individually and on behalf of the Connecticut Sub-Class against VWGoA.

208.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain.

Accordingly, VWGoA express warranty is an express warranty under Connecticut law.

209.   The Class Vehicles and component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

210.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

211.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

212.   VWGoA breached the express warranties by selling and leasing Class Vehicles that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the gateway control module and repairing the Defect. VWGoA has failed to "repair" the defects as alleged herein, even when Connecticut Plaintiff and members of the Connecticut Sub-Class paid for repairs.

213.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Connecticut Plaintiff and members of the Connecticut Sub-Class. Among other things, Connecticut Plaintiff and members of the Connecticut Sub-Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale. Connecticut Plaintiff and members of the Connecticut Sub-Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

214.   Because VWGoA has not been able remedy the Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

215.   Connecticut Plaintiff and members of the Connecticut Sub-Class were not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of gateway control module, and from other internal sources.

Connecticut Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

216.   In addition, on December 3, 2021, Connecticut Plaintiff gave notice to VWGoA that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

217.   As a direct and proximate cause of the breach of express warranty by VWGoA, Connecticut Plaintiff and members of the Connecticut Sub-Class have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Connecticut Plaintiff and members of the Connecticut Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

218.   Connecticut Plaintiff and members of the Connecticut Sub-Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## FIFTH CAUSE OF ACTION
### Violations of the Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201-.213, *et seq*.
### (On Behalf of the Florida Sub-Class against all Defendants)

219.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

220.   Plaintiff Melissa Anido ("Florida Plaintiff") brings this cause of action individually and on behalf of the Florida Sub-Class against all Defendants.

221.   Florida Plaintiff and the Florida Sub-Class Members are "consumer[s]" as that term is defined in Fla. Stat. § 501.203(7).

222.   VW engaged in "trade or commerce" in Florida as that term is defined in Fla. Stat. § 501.203(8).

223.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  VW engaged in unfair and deceptive practices that violated the FDUTPA as described above.

224.   VW participated in and engaged in deceptive business or trade practices prohibited by the FDUTPA by failing to disclose and actively concealing the Defect and its corresponding safety risk, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

225.  By failing to disclose the Defect; by concealing the Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, made with attention to detail, and of high quality; by presenting itself as a reputable

manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Florida Plaintiff and the Florida Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

226.    VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

227.    VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

228.    VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

229. VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

230. VW knew or should have known that its conduct violated the FDUTPA.

231. Florida Plaintiff and the Florida Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

232. Had Florida Plaintiff and the Florida Sub-Class Members known that the Class Vehicles possessed the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Florida Plaintiff and the Florida Sub-Class Members did not receive the benefit of their bargain as a result of VW's misconduct.

233. VW owed Florida Plaintiff and the Florida Sub-Class Members a duty to disclose the truth about the Defect because VW:

(a) possessed exclusive and superior knowledge of the design of the Class Vehicles and the Defect;

(b) intentionally concealed the foregoing from Florida Plaintiff and the Florida Sub-Class Members; and/or

(c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully

withholding material facts from Florida Plaintiff and the Florida Sub-Class Members that contradicted these representations.

234.    Due to VW's specific and superior knowledge that the Class Vehicles contain the Defect and its corresponding safety risk and reliance by Florida Plaintiff and the Florida Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Defect will cause Class Vehicles fail while being driven, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles,and that Class members would be required to bear the cost of the damage to their vehicles.

235.    Having volunteered to provide information to Florida Plaintiff and the Florida Sub-Class Members regarding safety, durability, reliability, and fitness for use, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Florida Plaintiff and the Florida Sub-Class Members.

236.    Performance and safety are material concerns to VW consumers. VW represented to Florida Plaintiff and the Florida Sub-Class Members that they were purchasing or leasing vehicles that were reliable, safe, efficient, of high quality, and containing advanced and superior characteristics and technology as alleged

throughout this Complaint, when in fact the Class Vehicles contain the Defect and have a corresponding safety risk.

237.   Florida Plaintiff and the Florida Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Florida Plaintiff and the Florida Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

238.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Florida Plaintiff and the Florida Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

239.   Defendants' violations present a continuing risk to Florida Plaintiff and the Florida Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

240.   As a proximate and direct result of VW's unfair and deceptive trade practices, Florida Plaintiff and members of the Florida Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Defect, and other substantial monetary damages and inconvenience.

241.  The Florida Plaintiff and members of the Florida Sub-Class seek monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

242.  Florida Plaintiff and the Florida Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUTPA. Because VW acted with willful and conscious disregard of the rights and safety of others, VW's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**SIXTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
(FLA. STAT. §§ 672.314 AND 680.212)
**(On behalf of the Florida Sub-Class against all Defendants)**

243.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

244.  Florida Plaintiff brings this cause of action individually and on behalf of the Florida Sub-Class against all Defendants.

245.  VW is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

246.  With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

247.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

248.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Fla. Stat. §§ 672.314 and 680.212.

249.    VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed the Class Vehicles to customers through authorized dealers, like those from whom Florida Plaintiff and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiff and the Florida Sub-Class Members, with no modification to the defective engines.

250.    VW provided Florida Plaintiff and Florida Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

251.    VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use.

252.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Florida Plaintiff and Florida Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective because they have the Defect and its corresponding safety risk.

253.    The Defect is inherent and was present in each Class Vehicle at the time of sale.

254.    As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Florida Plaintiff and Florida Sub-Class members were harmed and suffered actual damages in that the Class Vehicles and/or its components are substantially certain to fail before their expected useful life has run.

255.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Fla. Stat. §§ 672.314 and 680.212.

256.   Florida Plaintiff and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

257.   Florida Plaintiff and the Florida Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Defect from the complaints and service requests it received from Florida Plaintiff and the members of the Florida Sub-Class, from repairs and/or replacements of the engines or components thereof, and through other internal sources. Florida Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

258.   Because Florida Plaintiff purchased her vehicle from an authorized Audi dealership, she is in privity with Defendants. Florida Plaintiff and the members of the Florida Sub-Class have had sufficient direct dealings with VWGoA and its agents (dealerships and customer support personnel) to establish privity of contract between VWGoA, on one hand, and Florida Plaintiff and the members of the Florida Sub-Class, on the other hand. Furthermore, VWGoA provided warranties directly

to Florida Plaintiff and the members of the Florida Sub-Class and Florida Plaintiff and the members of the Florida Sub-Class are the intended beneficiaries of VWGoA's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only. VWGoA is also the agent of VWAG and Audi AG, designated by both to communicate with NHTSA regarding the safety of their vehicles.

259. Nonetheless, privity is not required here because Florida Plaintiff and the members of the Florida Sub-Class are the intended third-party beneficiaries of contracts between VWGoA and its dealerships. These contracts give the dealerships the right to sell Audi-branded vehicles, as well as service and perform warranty repairs on VWGoA's behalf. Florida Plaintiff and the members of the Florida Sub-Class are the beneficiaries of these contracts because they are the intended end-consumers and users of the products VWGoA distributes to its authorized dealerships. Florida Plaintiff and the members of the Florida Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than VWGoA's headquarters.

260. As a direct and proximate cause of VW's breach, Florida Plaintiff and the Florida Sub-Class Members suffered damages and continue to suffer damages,

including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiff and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

261.    As a direct and proximate result of VW's breach of the implied warranty of merchantability, Florida Plaintiff and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION

**Breach of the Express Warranty**
**FLA. STAT. §§ 672.314 AND 680.212**
**(On behalf of the Florida Sub-Class against VWGoA)**

262.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

263.    Florida Plaintiff brings this cause of action individually and on behalf of the Florida Sub-Class against all Defendants.

264.    VW is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

265.    With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

266.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

267. VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, VWGoA express warranty is an express warranty under Connecticut law.

268. The Class Vehicles and component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

269. In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

270. According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

271. VWGoA breached the express warranties by selling and leasing Class Vehicles that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the gateway control module and repairing the Defect. VWGoA has failed to

"repair" the defects as alleged herein, even when Florida Plaintiff and members of the Florida Sub-Class paid for repairs.

272.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Florida Plaintiff and members of the Florida Sub-Class. Among other things, Florida Plaintiff and members of the Florida Sub-Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

273.   Florida Plaintiff and members of the Florida Sub-Class have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

274.   Because VWGoA has not been able remedy the Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

275.   Florida Plaintiff and members of the Florida Sub-Class were not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or

replacements of gateway control module, and from other internal sources. Florida Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

276.   As a direct and proximate cause of the breach of express warranty by VWGoA, Florida Plaintiff and members of the Florida Sub-Class have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Florida Plaintiff and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

277.   Florida Plaintiff and members of the Florida Sub-Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## EIGHTH CAUSE OF ACTION
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,
### 815 ILCS 505/1, *et seq*.
### (On Behalf of the Illinois Sub-Class against all Defendants)

278.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

279.   Plaintiff Alan Wurzelbacher ("Illinois Plaintiff") brings this cause of action individually and on behalf of the Illinois Sub-Class against all Defendants.

280.   VW are "persons" as that term is defined in 815 ILCS 505/1(c).

281.   The Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

282.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. VW engaged in unfair and deceptive practices that violated the Illinois CFA as described above.

283.   VW participated in and engaged in deceptive business or trade practices prohibited by the Illinois CFA by failing to disclose and actively concealing the Defect and the corresponding safety defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

284.   By failing to disclose the Defect; by concealing the Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including

by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Illinois Plaintiff and the Illinois Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

285.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

286.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

287.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

288.    VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

289.    VW knew or should have known that its conduct violated the Illinois CFA.

290.    Illinois Plaintiff and the Illinois Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

291.    Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Illinois Plaintiff and the members of the Illinois Sub-Class did not receive the benefit of their bargain as a result of VW's misconduct.

292.    VW owed Illinois Plaintiff and the Illinois Sub-Class Members a duty to disclose the truth about the Defect because VW:

(a)    possessed exclusive and superior knowledge of the design of the Class Vehicles and the Defect;

(b)    intentionally concealed the foregoing from Illinois Plaintiff and the Illinois Sub-Class Members; and/or

(c)      made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Illinois Plaintiff and the Illinois Sub-Class Members that contradicted these representations.

293.  Due to VW's specific and superior knowledge that the Class Vehicles contained the Defect and it corresponding safety risk, its false representations regarding the increased durability of the Class Vehicles, and reliance by Illinois Plaintiff and the Illinois Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Defect will cause sudden failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles, and that Class members would be required to bear the cost of the damage to their vehicles.

294.  Having volunteered to provide information to Illinois Plaintiff and the Illinois Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Illinois Plaintiff and the Illinois Sub-Class Members.

295.  Performance and safety are material concerns to VW consumers. VW represented to Illinois Plaintiff and the Illinois Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high

quality, and containing advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact the Class Vehicles contain the Defect and its corresponding safety risk.

296.   Illinois Plaintiff and the Illinois Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

297.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

298.   Defendant's violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

299.   As a proximate and direct result of VW's unfair and deceptive trade practices, Illinois Plaintiff and members of the Illinois Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Defect, diminution of Class Vehicle resale value, increased

repair and maintenance costs, and other substantial monetary damages and inconvenience.

300.    Illinois Plaintiff provided notice of his claim by letter dated December 3, 2021.

301.    The Illinois Plaintiff and members of the Illinois Sub-Class seek monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

302.    The Illinois Plaintiff and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, et seq.

**NINTH CAUSE OF ACTION**
**Breach of Express Warranty**
**Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210**
**(On behalf of the Illinois Sub-Class against VWGoA)**

303.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

304.    Illinois Plaintiff brings this cause of action individually and on behalf of the Illinois Sub-Class against VWGoA.

305.    VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

306.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

307.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

308.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under Illinois law.

309.   The Class Vehicles and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

310.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

311.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

312.   VWGoA breached the express warranties by selling and leasing Class Vehicles with the Defect and its corresponding safety risk, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the gateway control module, and instead, charging for an ineffective repair. By simply replacing Illinois Plaintiff's and Illinois Sub-Class Members' failed gateway control modules without providing a long-lasting repair to the compartment, VWGoA has failed to "repair" the defects as alleged herein.

313.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Illinois Plaintiff and the Illinois Sub-Class Members. Among other things, Illinois Plaintiff and the Illinois Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

314.   Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

315.   Because VWGoA has not remedied the Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

316.   Plaintiff was not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, replacements of the gateway control module, and from other internal sources. Illinois Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

317.   In addition, on December 3, 2021, Illinois Plaintiff gave notice to Defendant that he intended to pursue his warranty claims, including on behalf of a class of similarly situated consumers.

318.   As a direct and proximate cause of the breach of express warranty by VWGoA, Illinois Plaintiff and the other Illinois Sub-Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Illinois Plaintiff and the other Illinois Sub-Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

319.   Illinois Plaintiff and the other Illinois Sub-Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### TENTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)**
**(On behalf of the Illinois Sub-Class against all Defendants)**

320.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

321.   Illinois Plaintiff brings this cause of action individually and on behalf of the Illinois Sub-Class against all Defendants.

322.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

323.   With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

324.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

325.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

326.    VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed the Class Vehicle to customers through authorized dealers, like those from whom Illinois Plaintiff and the Illinois Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and the Illinois Sub-Class Members, with no modification.

327.    VW provided Illinois Plaintiff and Illinois Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

328.    VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use.

329.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Illinois Plaintiff and Illinois Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, as described herein.

330.   The Defect is inherent and was present in each Class Vehicle at the time of sale.

331.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the, Illinois Plaintiff and Illinois Sub-Class members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

332.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

333.   Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

334.   Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Illinois Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

335.   In addition, on December 3, 2021, Illinois Plaintiff gave notice to Defendants that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

336.   Because Illinois Plaintiff purchased his vehicle from an authorized Audi dealership, he is in privity with Defendants.  Illinois Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with VWGoA and its agents (dealerships and customer support personnel) to establish privity of contract between VWGoA, on one hand, and Illinois Plaintiff and the members of the Illinois Sub-Class Sub-Class, on the other hand.  Furthermore, VWGoA provided warranties directly to Illinois Plaintiff and the members of the Illinois Sub-Class and Illinois Plaintiff and the members of the Illinois Sub-Class are the intended beneficiaries of VWGoA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty

agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only. VWGoA is also the agent of VWAG and Audi AG, designated by both to communicate with NHTSA regarding the safety of their vehicles.

337.   Nonetheless, privity is not required here because Illinois Plaintiff and the members of the Illinois Sub-Class are the intended third-party beneficiaries of contracts between VWGoA and its dealerships.  These contracts give the dealerships the right to sell Audi-branded vehicles, as well as service and perform warranty repairs on VWGoA's behalf.  Illinois Plaintiff and the members of the Illinois Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products VWGoA distributes to its authorized dealerships.  Illinois Plaintiff and the members of the Illinois Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than VWGoA's headquarters.

338.   As a direct and proximate cause of VW's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

339.  As a direct and proximate result of VW's breach of the implied warranty of merchantability, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be proven at trial.

### ELEVENTH CAUSE OF ACTION
**Fraud by Concealment, Fraud by Omission, and/or Fraud in the Inducement**
**(On Behalf of the Class, or in the Alternative, on Behalf of the individual Sub-Classes, against all Defendants)**

340.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1-146 of this Complaint.

341.  Plaintiffs bring this cause of action individually and on behalf of the Class, or in the alternative, on behalf of the individual Sub-Classes against all Defendants.

342.  VW concealed and suppressed and omitted material facts concerning the quality of the Class Vehicles, including the existence and extent of the Defect and its corresponding safety risk.

343.  VW concealed,suppressed and omitted material facts concerning the serious Defect causing the vehicle to fail at any time. Discovery will show that the Defect is the result of design and/or manufacture errors. VW knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles. VW further failed to disclose and/or denied the existence of the Defect when Plaintiffs and Class Members complained of the failure of their vehicles.

344.   VW did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of VW vehicles that the Class Vehicles were world-class, safe, warranted, and reliable vehicles, and concealed the information in order to prevent harm to VW and its products' reputations in the marketplace, to induce Plaintiffs and Class Members to purchase and/or lease the Class Vehicles, and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

345.   These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiffs' and Class Members' decisions to purchase or lease the Class Vehicles.

346.   VW had a duty to disclose the Defect in the Class Vehicles because it was known and/or accessible only to VW; VW had superior knowledge and access to the facts; and VW knew the facts were not known to or reasonably discoverable by Plaintiffs and Class Members.

347.   VW also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the actual quality, comfort, and usability of Class Vehicles.

348.    Even when faced with complaints regarding the Defect, VW misled and concealed the true cause of the symptoms complained of as described above. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the vehicles failures were complained of to VW.

349.    The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

350.    VW actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid the full cost of a recall that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiffs and Class Members.

351.    Discovery will show that VW has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding defects that exist in VW vehicles.

352.    Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class

Vehicles or would have paid less for them. Plaintiffs' and Class Members' actions were justified. VW was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

353.   Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the Defect that VW failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

354.   Accordingly, VW is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

355.   VW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich VW. VW's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## RELIEF REQUESTED

356.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a)   An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

(b)   A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles and the need for repair;

(c)   An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to remove, repair, and/or replace the Class Vehicles' with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d)   An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an

amount to be proven at trial;

(e)    Any and all remedies provided pursuant their various state law claims;

(f)    A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

(g)    An award of attorneys' fees and costs, as allowed by law;

(h)    An award of pre-judgment and post-judgment interest, as provided by law; and

(i)    Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

357.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues in this action so triable.

Dated: January 14, 2022        Respectfully Submitted,

                        /s/ Lawrence Deutsch
                        Lawrence Deutsch (NJ Bar No. 34971986)
                        Abigail J. Gertner (NJ Bar. No. 019632003)
                        **BERGER MONTAGUE PC**
                        1818 Market Street
                        Suite 3600

Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ldeutsch@bm.net
agertner@bm.net
*Attorneys for Plaintiffs and the Proposed Class and Subclasses*